UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Matthew V. Fredricksen,

Plaintiff,

vs.                                    REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

Defendant.              Civ. No. 05-2487 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


I.  <u>Introduction</u>

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, <u>Title 42 U.S.C. §405(g)</u>, seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB"), and Supplementary Security Income ("SSI").  The matter is now

before the Court on the parties' cross-Motions for Summary Judgment.  The Plaintiff

appears by Sean M. Quinn, Esq., and the Defendant  appears by Lonnie F. Bryan,

Assistant United States Attorney.  For reasons which follow, we recommend that the

Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II. Procedural History

The Plaintiff applied for DIB, and for SSI, on August 27, 2002,[1] at which time, he alleged that he had become disabled on August 5, 1994.  [T. 61-63, 258-60].  Through his counsel, he later amended the alleged onset date of disability to February of 2001.  [T. 149].  The Plaintiff met the insured status requirement at the amended onset date of disability, and remained insured for DIB through December 31, 2001. [T. 148].  On November 5, 2002, the State Agency denied the Plaintiff's initial application for disability.   [T. 31-40].   The Plaintiff subsequently filed for reconsideration of his applications on December 11, 2002.  [T. 41-42].  His request was denied by the State Agency on January 21, 2003.  [T. 43-45].  On September 24, 2003, a Hearing was held, before an Administrative Law Judge ("ALJ"), at which the Plaintiff, a medical expert ("ME"), and a  vocational expert ("VE") testified.  [T. 55-59; 289-327].

---

[1]The ALJ's report gives an initial application date of August 19, 2002, but that appears to be contradicted by the Record.

On February 10, 2004, the ALJ issued a decision finding that the Plaintiff was not disabled, because he was able to perform a significant number of jobs on a sustained, competitive level, in the national economy. [T. 17-29]. On April 7, 2004, the Plaintiff requested review of the ALJ's decision by the Appeals Council [T. 14-16; 274-75], that was denied on September 13, 2005. [T. 9-13]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.

## III.  Administrative Record

A.  Factual Background.  At the time of the ALJ's decision, the Plaintiff was fifty (50) years old, and was classified as "closely approaching advanced age" for the purposes of evaluation. [T. 27]. He is a high school graduate, and had prior work experience as a painter, group home worker, production assembler, and van driver -- all jobs that are performed at the medium exertional level, which requires lifting up to fifty (50) pounds occasionally. Id. The Plaintiff alleges that he cannot work due to multiple physical impairments, including gastric esophageal reflux disorder ("GERD"), with a history of duodenitis, irritable bowel syndrome ("IBS"), and internal hemorrhoids, as well as depression and dysthymic disorder, a history of a

fracture to the coccyx, a small right hernia, and low back pain.   Plaintiff's
Memorandum of Law in Support, Docket No. 8, at 3; see also, [T. 316].

The Plaintiff last worked at Floe International, as a production assembler of
snowmobile trailers and docks, where he worked for approximately one-and-one-half
(1 ½) years, from August of 1996 to October of 1997, and again from August of 1999
to October of 1999.  [T. 93, 100, 304, 321].

1.   The Plaintiff's Physical Impairments.   In January of 1992, the
Plaintiff saw an emergency room physician at Memorial Hospital-Cambridge
complaining of dried, and fresh blood, in his bowel movements.  [T. 151-52].  The
attending physician diagnosed him with an anal fissure and acute prostatitis, and
recommended increased fluid consumption and Metamucil.[2]  [T. 152].

The Plaintiff was treated for symptoms of sinusitis in May of 1993.  [T. 166].
In November of 1993 he visited his regular physician, Dr. J. P. Callen, with renewed
complaints about irregular bowel symptoms.  [T. 165].  Dr. Callen noted that the
Plaintiff had not had much relief from his symptoms with the use of Metamucil alone,

---

[2]Metamucil is the brand name for a bulk forming, natural therapeutic fiber, which
contains Psyllium Husk, and is used for "restoring and maintaining regularity when
recommended by a physician."  It has been found to be effective in the treatment of
constipation associated with IBS.  Physician's Desk Reference, pp. 2672-2673 (60th
Ed. 2006).

and he prescribed Donnatol.[3]   Id.   He also referred the Plaintiff to Dr. Thomas

Tunberg.   Id.   On referral, the Plaintiff told Dr. Tunberg that he suffered from

continued bloody stools and urine, diarrhea, and had experienced a recent, significant

weight loss of fifteen (15) pounds in three (3) weeks.   [T. 153-54].   Dr. Tunberg

performed a colonoscopy on the Plaintiff, and found no significant irregularities

besides internal hemorrhoids, and recommended that the Plaintiff increase the fiber

in his diet.   Id.

The Plaintiff's problems with IBS continued in March of 1994, when he

presented to Dr. Allen J. Mork with intermittent abdominal cramping and diarrhea,

and pressure on his lower back.   [T. 165].   The Plaintiff reported that he was still

taking Metamucil and Donnatol, and Dr. Mork suggested that he continue with those

medications but seek a referral to Dr. P. Dickinson if his symptoms did not abate.   Id.

Citing continued IBS symptoms, as well as abdominal cramping, back pain, excessive

fatigue, and lack of energy, on April 6, 1994, the Plaintiff did see Dr. Dickinson.   [T.

168].   In his notations, Dr. Dickinson observed that the Plaintiff "has lost much time

from work because of the symptom[s] and is considering quitting his job altogether,"

---

[3]Donnatal is the brand name for a preparation of Phenobarbital, Hyoscyamine
Sulfate, Atropine Sulfate, and Scopolamine Hydrobromide, which is used in the
treatment of IBS.   Physician's Desk Reference, p. 2503 (60th Ed. 2006).

and gave the Plaintiff a trial prescription of Bentyl.[4]  Id.  On April 20, 1994, the

Plaintiff saw Dr. Dickinson for a follow-up and reported that, since his last visit, his

bowel movements had been more regular, but that he still suffered from lack of

energy, and had told his employer that he was going to take a six (6) month leave of

absence because of his health.  [T. 167].  Dr. Dickinson recommended that the

Plaintiff continue taking Bentyl, and consider having a cholecystectomy,[5] in order to

treat his "smorgasboard of symptoms."  Id.

Following Dr. Dickinson's advice, on May 12, 1994, the Plaintiff saw Dr.

Tunberg for surgical consultation concerning his "chronic biliary dysfunction."  [T.

164].  The Plaintiff reported that "at times, his nausea and bloating and gassiness and

dyspepsia [became] so severe that it is very difficult for him to work."  Id.  On May

17, 1994, Dr. Tunberg performed a laparoscopic cholecystectomy, and

esophagogastroduodenoscopy,[6] in order to address the Plaintiff's chronic intermittent

---

[4]Bentyl is the brand name for a preparation of Dicyclomine Hydrochloride, which is used in the treatment of IBS, that relieves smooth muscle spasm of the gastrointestinal tract.  Physician's Desk Reference, pp. 724-726 (60th Ed. 2006).

[5]A cholecystectomy is the surgical removal of the gallbladder.  Dorland's Illustrated Medical Dictionary, p. 340 (29th Ed. 2000).

[6]An esophagogastroduodenoscopy is an endoscopic examination of the esophagus,
(continued...)

nausea and epigastric pain.   [T. 158-59].   The surgeon removed the Plaintiff's gallbladder, and found that it contained a large one and one-half (1½) centimeter, firm gallstone.  [T. 159-60].  The Plaintiff was discharged with pain medication, and with restricted activity for one (1) week, and Dr. Tunberg noted that he "expect[ed] [the Plaintiff] to do well."  [T. 161].  On June 2, 1994, Dr. Tunberg met again with the Plaintiff and reported that he had been doing "dramatically better since his surgery." [T. 164].

The improvement in the Plaintiff's condition did not last long, however, and on August 3, 1994, the Plaintiff was seen by Dr. A. J. Mock complaining of abdominal discomfort and diarrhea, that he felt was exacerbated by stress, as well as intermittent chest discomfort.  [T. 163].  He reported that he had recently quit his job and was working on his own.  Id.  Dr. Mock again recommended that the Plaintiff increase his dietary fiber to treat his IBS symptoms.  Id.  On August 5, 1994, the Plaintiff returned to Dr. Mork, this time reporting chest pain, but the doctor found no serious abnormalities, and he recommended that the Plaintiff give up smoking.  Id.

---

[6](...continued)
stomach, and duodenum.  Dorland's Illustrated Medical Dictionary, p. 622 (29th Ed. 2000).

In January of 1998, the Plaintiff saw Dr. Nancy Zupan with a cough and congestion. [T. 195]. Dr. Zupan noted that the Plaintiff had smoked 2 (two) to 3 (three) packs of cigarettes a day for 25 years, and treated him for bronchitis. Id. On February 4, 1998, the Plaintiff came to the emergency room complaining of shortness of breath, and was again treated for bronchitis. [T. 175-76].

The Plaintiff appeared at the Ripple River Medical Center in September of 1998, reporting IBS symptoms and expressing his desire to apply for DIB. [T. 192]. At that time, he reported that he was not taking any medications, although the attending physician noted that, previously, the Plaintiff had coped with abdominal pain by taking Prilosec,[7] and by elevating the head of his bed. Id. The Plaintiff complained of abdominal discomfort whenever he ate, as well as frequent bowel movements -- five (5) or more times a day -- with "a lot of fecal urgency." Id. The attending physician did not prescribe the Plaintiff any new medications, but suggested that, if his problems persisted, he should seek further evaluation and treatment. [T. 194].

---

[7]Prilosec is the brand name for Omeprazole, which is administered for the treatment of frequent heartburn. Physician's Desk Reference, pp. 653, 2674 (60th Ed. 2006).

On December 1, 1999, the Plaintiff was seen at Ripple River Medical Center for erectile dysfunction, and also for the symptoms of IBS and GERD. [T. 188]. The attending physician noted that the Plaintiff's bowel symptoms waxed and waned, and that he was currently treating them with hot baths and Imodium.[8] Id. The Plaintiff also reported that, since he had stopped working at Floe International, his stress level, and his symptoms, had improved. [T. 188-89]. He was prescribed Prilosec for his IBS symptoms, and Viagra[9] for his erectile dysfunction. [T. 191]. On June 8, 2001, the Plaintiff saw Dr. Janet Larson for a refill of Viagra, and reported that he felt he had his IBS symptoms "quite under control," with "no significant change in his bowel habits." [T. 185]. He also admitted that he smoked marijuana approximately every other day, because he felt it helped control the spasms in his colon. Id.

On August 22, 2002, the Plaintiff saw Dr. Thomas Lawson for multiple concerns, including IBS, cramping, and blood in his stools. [T. 179]. He reported that

---

[8]Imodium is the brand name for a preparation of Loperamide Hydrochloride that is employed in the "control and symptomatic relief of acute nonspecific diarrhea and of chronic diarrhea associated with inflammatory bowel disease." Physician's Desk Reference, pp. 1834-1835 (60th Ed. 2006).

[9]Viagra is the brand name for Sildenafil Citrate, which is "a selective inhibitor of cyclic guanosine monophosphate (cGMP)-specific phosphodiesterase type 5 (PDE5)." It has been found to be effective in the treatment of erectile dysfunction. Physician's Desk Reference, pp. 2552-2556 (60th Ed. 2006).

his abdominal cramping seemed to be aggravated by riding in a car, certain foods, and stress. Id. The Plaintiff also mentioned experiencing some chronic low back pain, that caused him problems when he tried to sit for longer periods of time. [T. 180]. Dr. Lawson recommended that he come back in a few weeks if the symptoms continued. [T. 184]. The Plaintiff's problems with abdominal cramping and discomfort persisted and, in September of 2002, he reported intermittent bloody stools. [T. 221-22]. The Plaintiff told his doctor that he had also been suffering from ongoing low back pain, but that he had received "some relief" by seeing a chiropractor generally once a week. [T. 221].

In November of 2002, the Plaintiff was referred by the State Disability Determination Agency to Dr. William J. Paule, a medical consultant, for an evaluation of his physical state, based upon the Plaintiff's medical records. [T. 208-210]. Dr. Paule reviewed the Plaintiff's medical records, and found no evidence that any of the Plaintiff's physical impairments were severe. [T. 210]. In particular, Dr. Paule found that the Plaintiff's GERD had been controlled by medications for some time, and suggested that the bloody stools could be attributed to the internal hemorrhoids. Id. Dr. Paule found no reports of chronic recurring back difficulties, nor could he locate any x-rays of the Plaintiff's back in his medical records. Id. Later in November of

2002, the Plaintiff saw his regular physician for continued abdominal cramping and occasional bloody stools, [T. 252-53], which persisted to January of 2003. [T. 249-250]. On January, 21, 2003, Dr. Paul A. Severson performed a second esophagogastroduodenscopy on the Plaintiff. [T. 243-44]. Dr. Severson found only mild gastritis and mild duodenitis, and no evidence of GERD or Crohn's disease. [T. 243]. A few days later, Dr. Severson performed a colonoscopy on the Plaintiff, and found, as the only abnormality, a number of large internal hemorrhoids, with no evidence of any colon disease. [T. 241-42]. The Plaintiff was seen for a follow-up on February 7, 2003, at which time, he reported that his lower back pain caused him to continue to be quite limited in sitting, bending, and stooping. [T. 246].

2. The Plaintiff's Psychological Impairments. In November of 1992, the Plaintiff was treated at, and released from, the Memorial Hospital Emergency Room after suffering emotional shock following a car accident. [T. 155]. The Plaintiff saw Dr. Lawson in August of 2002, complaining of depression, decreased energy, and anxiety. [T. 179]. He expressed "frustration at having been unable to be gainfully employed over the past few years," and confessed that he had recently been having significant problems with depression, and had contemplated suicide. Id. He

also reported having panic attacks that required him to breathe into a paper bag to calm down. Id. He was prescribed Paxil[10] for his anxiety and depression. [T. 183].

During a visit on September 18, 2002, the Plaintiff told his doctor that "his mood is significantly improved" on Paxil, his anxiety level had also gone down significantly, and he was better able to sleep and concentrate. [T. 222].

The State Agency arranged for a psychological evaluation of the Plaintiff by psychologist Lynne E. Johnson ("Johnson"), on September 23, 2002. [T. 203-07]. The Plaintiff told Johnson that he had significant abdominal pain, with persistent diarrhea and frequent rectal bleeding, and chronic back pain which limited his ability to sit or walk. [T. 203]. He presented to Johnson hunched over and walking slowly. Id. He reported that, before he started taking Paxil he had rated his depression and anxiety as 10/10, but at the time of the evaluation he rated his state as 7-8/10. Id. He indicated that he had trouble sleeping, felt helpless and worthless, and had low energy and difficulty concentrating. [T. 203-04]. His performance on the mental status examination showed defects in concentration and memory, and Johnson felt that the

---

[10]Paxil is the brand name for Paroxetine Hydrochloride, which is administered for the treatment of "major depressive disorder, social anxiety disorder, obsessive compulsive disorder (OCD), panic disorder (PD), generalized anxiety disorder (GAD), and posttraumatic stress disorder (PTSD)." Physician's Desk Reference, pp. 1501-1509 (60th Ed. 2006).

Plaintiff would not be able to remember, or carry out job instructions, or tolerate stressors in the workplace. [T. 207]. She diagnosed major depression, dysthymia, and a pain disorder, based on the Plaintiff's physical impairments. Id.

The Plaintiff visited his own physician in November of 2002, and the doctor found improvement in his mood, and no signs of acute physical distress. [T. 218-19]. By February 7, 2003, the Plaintiff reported that his mental health continued to improve, that he no longer experienced thoughts of self-harm or injury, and that, in general, he was dealing better with his anxiety. [T. 246].

In January of 2003, the State Agency referred the Plaintiff to Dr. Thomas Kuhlman, a psychologist, for consultative evaluation. [T. 225-238]. Dr. Kuhlman reviewed the available medical evidence, and evaluated the Plaintiff's impairments regarding Listings 12.04 (affective disorders), and 12.07 (somatoform disorders). [T. 235]. Dr. Kuhlman found that the Plaintiff was moderately restricted in daily living activities, had mild difficulties in maintaining social functioning, and had moderate difficulty maintaining concentration. Id. However, he opined that the Plaintiff was not markedly impaired in any area of mental functioning. Id.

B.    Hearing Testimony. The Hearing on September 24, 2004, commenced with some opening remarks by the ALJ. [T. 289-93]. The Plaintiff's attorney did not

object to any of the evidence in the Record, and did not have any additional documents to add to the Record.  [T. 292].  The ALJ then began questioning the Plaintiff.  [T. 293].

The Plaintiff testified that he lived with his wife in a one-story house.  [T. 293-94].  He graduated from high school with a "non-satisfactory pass" diploma, could read and write with sixth grade ability, and could perform addition and subtraction, but not multiplication or division.  [T. 294].  The Plaintiff testified that he had a valid driver's license, and drove his own vehicle to the Hearing.  [T. 295].

When the ALJ asked about his medical history, the Plaintiff explained that he experienced sharp pains in his stomach, IBS, with blood in his bowel movements, chronic back pain, and depression.  [T. 296].  The Plaintiff reported that, within two (2) months prior to the Hearing, he had seen his physician, Dr. Lawson, for IBS and depression that he attributed to attending his mother's funeral. [T. 297].  The Plaintiff expressed his belief that his depression was linked to his physical problems, but added that both his mental and physical problems had been getting worse since he applied for DIB.  Id.  For the past two years, the Plaintiff had been going to a chiropractor once a week for back pain, but could "stretch it to two weeks when [he was] doing pretty good."  [T. 298].  The ALJ asked the Plaintiff if his visits to the chiropractor

- 14 -

gave him relief, and the Plaintiff said that they resulted in less pain in his back.  [T. 298-99].  The ALJ then asked the Plaintiff to explain what was wrong with his back. [T. 299].  The Plaintiff explained that he suffered from chronic back pain as a result of being struck by a taxi and breaking his tail bone, and from twice having a one-hundred (100) pound spot-welding gun fall on him, which put him in traction, and required him to wear a back brace, for over a year.  Id.  The Plaintiff's doctors had given him stretching exercises to keep his back limber, along with pain medication, but he admitted that he only took the pain medication intermittently.  [T. 299-300].

Next, the ALJ asked the Plaintiff about his regular life at home.  He testified that he no longer consumed alcohol, after attending a treatment program in the mid-1980s.  [T. 300].  The Plaintiff explained that he did not sleep well at night, and could only eat one (1) meal a day because, within a half-hour of eating, he suffered from a prolonged bowel movement, or cramps.  [T. 301].  He engaged in light housework, but found that his back prevented him from standing for long periods of time.  Id.  The Plaintiff reported being unable to garden, cut grass for more than ten (10) minutes at a time, or drive more often than monthly.  [T. 302-03].  He attended church once a month, and claimed that he was able to participate in the service by standing and singing.  [T. 302].  Generally, when at home, the Plaintiff watched television.  [T.

303].  He had not gone to a movie in the past four (4) or five (5) years, did not hunt

or fish, gamble, dance, or swim.  <u>Id.</u>  He reported that he could perform his own

grooming, and feed and dress himself.  <u>Id.</u>  The Plaintiff admitted to smoking one (1)

pack of cigarettes a day, and to smoking marijuana two (2) or three (3) times a week

because he believed it relaxed his stomach.  [T. 303-04].  However, he had not

smoked any marijuana on the day of the Hearing.  [T. 304].

The ALJ asked the Plaintiff about his work history, and the Plaintiff said he had

last worked five (5) or six (6) years ago.  <u>Id.</u>  The ALJ then turned to questions about

the Plaintiff's physical abilities.  The Plaintiff reported that he could walk for about

fifteen (15) or twenty (20) minutes at a time, before having to stop, and could stand

for twenty (20) minutes.  <u>Id.</u>  He could bend at the waist, but not stoop or squat, and

he had occasional numbness in his arms and fingers, along with a weak grip.  [T. 305].

He noted that, if he tried to pick up a piece of plywood, it would "just slip[] out" of

his hand.  <u>Id.</u>  He felt that he could sit for approximately fifteen (15) minutes at a time,

although, on questioning, he admitted that if he were able to "switch" his position, he

could sit for nearly half an hour.  [T. 306].  The Plaintiff guessed that he could lift

thirty-five (35) pounds "if [he] had to," but that he could not repeat that often.  <u>Id.</u>

- 16 -

When asked by the ALJ about his memory and concentration, the Plaintiff reported being very forgetful.  Id.  He told the ALJ that, while he used to be able to get along with people, he now found himself impatient.  [T. 308].  He also admitted that he had contemplated suicide, within the past four (4) years.  Id.  However, with his current medications he was no longer contemplating suicide.  [T. 309].

The ALJ then asked the Plaintiff if he had anything to add.  [T. 310].  The Plaintiff replied that he wanted the ALJ to know that, although he was "not one to buck on my responsibilities," when he tried to work he "might be able to get by and [] do the day, but I'll suffer for two days after for doing it."  Id.  He explained that he just felt "worn out to where [he] can't do 9:00-to-5:00s."  [T. 310].

At that point, the Plaintiff's counsel questioned him about his work history, and he explained that, in the past, he had worked at his mother's antique business putting price tags on goods, moving furniture, and preparing for estate sales.  [T. 310-11].  His counsel next asked the Plaintiff to clarify how often he needed to use the bathroom during the day.  [T. 311].  The Plaintiff reported that he had to go to the bathroom "every time [he got] physically going," and added that he spends "darn near 45 minutes to an hour" on the toilet every morning, followed by about forty (40) minutes in the bathtub "relaxing his colon," and the muscles in his back.  [T. 312].  On a good

day, he could watch television, cut the grass, or move firewood into his house, but he would have to stop and rest when his symptoms returned.  [T. 313].  The Plaintiff added that he was able to act as the Fire Warden for his Township, and that the position allowed him to feel "useful and part of the community."  Id.

The Hearing continued with the testimony of a Medical Expert ("ME"), who confirmed that he had never treated the Plaintiff as a patient, but that he had reviewed all of the available medical evidence.  [T. 314].  The Plaintiff's attorney had no objection to the ME's qualifications, and the ME was allowed to question the Plaintiff. Id.  The ME first asked the Plaintiff about his daily medications.  Id.  The Plaintiff responded that he took prescriptive medicines daily for GERD, IBS, and depression. [T. 314-15].  The ME was then sworn, and gave his testimony about the Plaintiff's impairments.  [T. 316].

The ME found that the Plaintiff had GERD with a history of duodenitis, IBS, internal hemorrhoids, a history of tobacco and substance abuse, depression, and dysthymic disorder.  Id.  Although the ME found a history of back pain, he was unable to find any x-rays in the Plaintiff's record, and noted only one (1) exam of his back, which had been performed recently.  Id.  The ME expressed the opinion that none of

- 18 -

those impairments met the severity required by the Commissioner's Listing,[11] either individually, or in combination, and that the Plaintiff had a residual functional capacity ("RFC")[12] between medium and light.  [T. 318].  He added that, for him to be able to perform a job, the Plaintiff would need to be near a restroom, and have "the ability to go when necessary to the bathroom."  Id.  The Plaintiff would also need a sit/stand option, would have some limitation in climbing ramps, ropes, and scaffolds, and should avoid machinery and hazards.  Id.

The Plaintiff's counsel then questioned the ME, who clarified that the Plaintiff could lift more than twenty (20) pounds, but less than fifty (50) pounds.  [T. 318-19].  The ME acknowledged that he had not included back pain into his RFC assessment, because he did not see it supported in the Record through x-rays or MRIs, but he added that he was "giving some credence there for pain."  [T. 319].  Further, the ME admitted that there could be an additional impact on RFC given the Plaintiff's

---

[11]20 C.F.R. §404, Subpart P, Appendix 1, contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, the claimant is found disabled without considering vocational factors.

[12]RFC is defined as the most an individual can still do after considering the effects of physical or mental limitations that affect that individual's ability to perform work-related tasks.  20 C.F.R. §§404.1545 and 416.945.

depression, which he was not taking into account, because he was charged only with the assessment of the Plaintiff's physical state.  Id.

Thereafter, the Hearing continued with the testimony of the Vocational Expert ("VE"), who had reviewed the vocational evidence in the Plaintiff's file, and who was familiar with jobs in the State of Minnesota.  Id.  The Plaintiff's attorney had no objection to the VE's qualifications.  Id.  The VE asked the Plaintiff about his past and present income.  Id.  The Plaintiff explained that, when he worked with his mother selling antiques, he earned less than $6,000 a year, and that he subsequently had worked primarily as a full-time assembly worker.  [T. 320-21].  He worked as a street sweeper assembler for fourteen (14) years, assembled snow mobiles and docks for about two (2) years, with several shorter jobs in the interim that lasted between six (6) to seven (7) months.  [T. 321].  Based on the Plaintiff's testimony, the VE then altered his report to reflect that the Plaintiff had no relevant experience as an antique dealer.  [T. 322].  He also altered his description of the Plaintiff's experience as a production assembler, from a light to a medium strength position.  Id.

The VE then testified that, given the Plaintiff's current limitations, including light work, avoiding climbing, balancing, and scaffolding, having a sit/stand option, ready access to a bathroom with unlimited ability to visit the same at will, and

avoiding machinery and hazards, he doubted that the Plaintiff could return to his past relevant work.  [T. 322-23].  The ALJ then posed a hypothetical to the VE, which asked him to assume a fifty (50) year old person with a high school education and work experience as a group home worker, production assembler, and van driver, who is impaired by GERD, IBS, minor hernia, depression, back pain, and tobacco and substance abuse history.  [T. 323].

The ALJ related that the individual was taking his prescribed medications, his physical activities presently limited him to lift or carrying no more than twenty (20) pounds, standing and walking for six (6) hours out of an eight (8) hour day, and sitting for six (6), but had to have an opportunity to change positions at will.  [T. 324]. Further, the person was limited in that he could only occasionally stoop, crouch, kneel, and crawl, and should avoid climbing, balancing, and scaffolding.  Id.  Finally, the person should have ready access to bathroom facilities, with an unlimited ability to visit them at will, and would have to avoid dangerous operating machinery and hazardous heights.  Id.

With those limitations in mind, the VE testified that there were jobs that the hypothetical person could perform.  Id.  The VE noted that the person could work in wrapping and packing operations, as a bander, cellophaner, wrapping-machine

operator, poly-packer and heat sealer, of which there were more than 8,000 positions listed as available in the State Census.  Id.  The VE also concluded that the hypothetical person could work in a bench-assembly operation, as an assembler of small parts, mechanical pencils, or vacuum bottles, with more than 5,000 positions listed as available in the State Census.  Id.  All of the jobs identified by the VE were unskilled, light occupations, that would allow a sit/stand option.  Id.  However, the hypothetical person could not fulfill the requirements of the Plaintiff's former job as a production assembler, because there would not usually be a sit/stand option.  [T. 324-25].

The ALJ then asked the VE about how the bathroom limitations would affect the jobs the hypothetical person could perform.  [T. 325].  The VE explained that an employer would tolerate use of the bathroom during breaks, before and after work, and during normal lunch periods but, "if a person had to use the facilities beyond those parameters," it was his opinion that "most employers probably wouldn't tolerate it."  Id.  He added that, while some employers might be willing to give an employee one extra bathroom break, none would accept an employee who was gone from the work setting up to five (5) times a day, especially if that person would be missing for ten (10) to twenty (20) minutes at a time.  Id.  The ALJ then asked if anything in the

VE's assessment would change if he added the condition that the work had to be simple and unskilled, with minimal stress and minimal contact with other employees and the public.  Id.  The VE felt that those additional conditions would not change his testimony, as the only significant stress factor would be as a result of the person's depression.  [T. 325-26].  The Plaintiff's attorney did not have any questions for the VE.  [T. 326].  At that point, the Hearing concluded with the ALJ stating his intention to issue a written decision.  Id.

C.    The ALJ's Decision.  The ALJ issued his decision on February 10, 2004. [T. 20-29].   As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520 and 416.920.[13]  As a

---

[13]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

(continued...)

threshold matter, the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  [T. 21].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise his ability to engage in work activity.  [T. 21].  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, the opinions of the Agency Physician consultants, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely physically impaired by IBS, GERD, internal hemorrhoids, and low back pain.  [T. 21-22].  Evaluating the Plaintiff's mental impairments, the ALJ also found that the Plaintiff suffered from depression with anxiety, but that the restrictions on his activities of daily living were generally mild, with only moderate difficulties maintaining social functioning and concentration.  [T. 23].

---

[13](...continued)
Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

At the Third Step, the ALJ compared the Plaintiff's severe physical impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d) and 416.920(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the Testimony of the ME and the Record.  [T. 22].

The ALJ then discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure.  See, 20 C.F.R. §§404.1520a and 416.920(a).  The four broad areas, which are relevant to the ability to work, are:  activities of daily living ("ADL"); social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id.  After examining the medical evidence, the ALJ concluded that the Plaintiff was only moderately limited in his ability to maintain social functioning and concentration.  [T. 23].  Consequently, he was limited to work that was simple and unskilled, involved minimal levels of stress, and required minimal contact with others.  Id.  The ALJ did not accept the findings of Johnson, that the Plaintiff was completely unable to tolerate the stressors of the workplace, and found, instead, that the Record demonstrated that the Plaintiff could tolerate very low levels of stress.  Id.  In addition, the ALJ determined that, because of his mental impairments, the Plaintiff had

"moderate" difficulties in the areas of concentration, persistence, pace, and social functioning.  Id.  He saw "no evidence of marked or extreme limitation of function" in his mental functioning, that is, "the level of dysfunction required to be considered 'disabling.'"  Id.

The ALJ further concluded that the Plaintiff had not experienced any repeated episodes of decompensation.  [T. 23].  In addition, the ALJ found that the Plaintiff's mental impairments did not meet, or medically equal, the "C" criteria, as set forth in Section 12.00 of the Listings.  Id.  The ALJ based that determination on the conclusions of Dr. Lawson, the report by Johnson, the records from the Plaintiff's treating physicians, and the evidence as a whole.  [T. 22].  The ALJ commented that, according to the Record, the Plaintiff reportedly engaged in appropriate ADL, which included providing his own transportation, shopping, arranging and keeping medical appointments, and acting as a Fire Warden -- which, the ALJ noted, was consistent with only a mild restriction in daily living.  [T. 23].  The ALJ's review of the functional limitations experienced by the Plaintiff, as a result of his depression with anxiety, showed that they were severe, but did not meet or equal the criteria of Section 12.04 of the Listing of Impairments.  [T. 23-24].

The ALJ then proceeded to determine the Plaintiff's RFC.  [T. 25].  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), <u>Social Security Ruling 96-7p</u>, and <u>Title 20 C.F.R. §§ 404.1529 and 416.929</u>.  After considering the entire Record, including the testimony adduced at the Hearing, the opinions of the Plaintiff's treating physicians, the impartial ME, the objective medical evidence, the State Agency consultants,  and the Plaintiff's subjective complaints of pain, the ALJ determined the Plaintiff's RFC to be as follows:

> The [Plaintiff] retains the residual functional capacity for lifting 20 pounds occasionally, sitting up to six hours and standing and/or walking up to six hours for a total of eight hours per work day with a change of positions at will, occasional stooping [,] crouching, crawling, and kneeling, no climbing, balancing, scaffolds, heights or work around dangerous machinery, that allows for one or two bathroom breaks in addition to using the bathroom during morning

> and afternoon breaks, the lunch period, and before and after
> work, that [is] simple and unskilled, and involves minimal
> levels of stress and minimal contact with others.

[T. 25].

The ALJ determined that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that he was disabled from all work activity by his impairments. Id.

The ALJ determined that the Plaintiff's subjective complaints of abnormal bowel function, and low back pain, were credible. Id. Further, the ALJ found that the Record supported the Plaintiff's complaint that the IBS flared up when he was subject to stress, so he was restricted to jobs carrying a minimal stress level arising from both his mental and physical limitations. Id. However, the ALJ concluded that the Plaintiff's claim, that he spends up to an hour in the bathroom on first getting up, with frequent bouts of diarrhea, were not supported by the Record. [T. 26]. Specifically, the Plaintiff failed to complain of frequent, or urgent bowel movements, when he saw Dr. Lawson in 2001 or 2002, and a colonoscopy found no serious abnormalities other than internal hemorrhoids. Id.

In January of 2003, the Plaintiff reported having only two (2) to three (3) bowel movements a day. Id. According to the ALJ, the Record reflected that, while the

Plaintiff suffered from IBS, his condition was fairly well controlled with dietary changes and the occasional use of medications.  Id.  Regarding the Plaintiff's mental health, the ALJ determined that the Plaintiff was able to get along with others, including friends and family, and that he frequently met with friends to play music. [T. 25].  The ALJ saw no indication in the Record of social dysfunction, such a fights or arrests, that would preclude all work with others.  [T. 26].

As a result of his review of the Record, as well as the report of the State Agency medical consultants, and lay testimony -- in the form of letters from the Plaintiff's former employer, and a friend -- the ALJ also discounted the assessment of the ME that the Plaintiff would need to have free access to a bathroom in a work setting.  Id.

Proceeding to the Fourth Step, the ALJ determined that, based upon the VE's analysis, inclusive of the RFC found by the ALJ, the Plaintiff could not perform his past relevant work.  [T. 27].

Accordingly, the ALJ noted that the burden shifted to the Commissioner to establish the final step; namely, whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience.  Id.  The ALJ noted that the Plaintiff was currently 50 years old, which is defined as an individual closely approaching advanced age. Id.;

see also, Title 20 C.F.R. §§404.1563, and 416.963.   As related by the ALJ,

considering the Plaintiff's age, education, past relevant work experience, and RFC,

the VE had opined that the Plaintiff could perform work as a wrapper or packer, of

which there were 8,000 jobs in the regional economy which met the proposed

hypothetical, or as a small parts benchwork assembler, of which there were 5,000 jobs

in the regional economy.  Id.

## III.  Discussion

A.     Standard of Review.  The Commissioner's decision must be affirmed if

it conforms to the law and is supported by substantial evidence on the Record as a

whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413

F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002);

Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more

than a mere search for the existence of evidence supporting the Commissioner's

decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of

the evidence must take into account whatever fairly detracts from its weight, see, Cox

v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra

at 721, and the notable distinction between "substantial evidence," and "substantial

evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004);

Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo. See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445

(8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92

F.3d 672, 675 (8th Cir. 1996).

     B.    <u>Legal Analysis</u>.  In support of his Motion for Summary Judgment, the

Plaintiff advances the following arguments:

    1.    That The RFC Assessed By The ALJ Was Incorrect; and

    2.    That the ALJ Wrongfully Refused To Order Post-Hearing Consultative
        Examinations To Determine The Plaintiff's Physical And Mental
        Disabilities.

See, <u>Plaintiff's Memorandum</u>, at 9, 11-12.

We address each contention below.

    1.    <u>Whether the RFC Determined by the ALJ Was Incorrect.</u>

     The Plaintiff argues that the RFC determination of the ALJ was

incorrect, because the ALJ improperly discounted the Plaintiff's subjective

complaints, failed to give proper weight to the opinion of the ME, and disregarded

aspects of the psychological assessment of Johnson, the State Agency psychological

consultant.  Since the ALJ's evaluation of the Plaintiff's credibility impacts upon the

weight he accorded to the ME's opinion, as well as that of Johnson, we address the

credibility issue first.

a.      Whether the ALJ Improperly Discounted the Plaintiff's Subjective Complaints.

(1)     Standard of Review.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  Driggins v. Bowen, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990).  These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  See, Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

- 34 -

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Flaherty v. Halter, 182 F. Supp. 2d 824, 829 (D. Minn. 2001);  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

> 1.      the claimant's daily activities;
>
> 2.      the duration, frequency, and intensity of the pain;
>
> 3.      precipitating and aggravating factors;
>
> 4.      dosage, effectiveness and side effects of medication;
>
> and
>
> 5.      functional restrictions.

Polaski v. Heckler, supra at 1321-22; see also, Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006)(listing factors for credibility analysis); Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006)(same).

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole.

Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied. For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.

Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; doing yard work, Swope v. Barnhart, 436 F. 3d 1023, 1024 (8th Cir. 2006); and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider

- 37 -

in the evaluation of subjective complaints of pain.  Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

(2)    Legal Analysis.  In arriving at his RFC, the ALJ found the testimony of the Plaintiff to be wholly credible concerning his abnormal bowel function and low back pain, while he discredited the Plaintiff's testimony, insofar as the Plaintiff asserted that he was completely disabled from all work activity, as not being consistent with the Record as a whole.  Guided by Polaski v. Heckler, and its progeny, the ALJ found the credibility of the Plaintiff, as to the severity of his impairments, to be undermined by his medical records, and ADL.

In discounting the Plaintiff's testimony, the ALJ referenced specific medical evidence that related to the Plaintiff's complaints.  Specifically, the ALJ cited to the medical reports from a visit to Dr. Lawson in June of 2001, after the Plaintiff's alleged onset date of February of 2001, in which the Plaintiff reported that his IBS symptoms were "quite under control," with no significant change in his bowel habits.  [T. 26]. The ALJ noted that, during his next two visits with his physician, the Plaintiff failed to complain of frequent or urgent bowel movements, and that, in January of 2003, the Plaintiff reported having two (2) to three (3) bowel movements a day.  Id.  Finally, the ALJ pointed to evidence in the Record that dietary changes, and occasional use of

medications, had given the Plaintiff significant relief from his IBS symptoms. Id. After considering the objective evidence, and the history of successful treatment, which reflected that the Plaintiff's IBS did not require him to have unlimited access to a bathroom throughout the workday, the ALJ determined that a greater limitation would not be supported by the Record as a whole.

The ALJ also found that the Plaintiff's daily activities were inconsistent with the degree of impairment that the Plaintiff was claiming. In this respect, the ALJ relied on the testimony which reflected that the Plaintiff retained his capacity to drive for long periods, vacuum, cut the grass with breaks, bring in firewood as needed, collect eggs, and shop for his personal needs, which demonstrated that the Plaintiff was able to function at a level that was accommodated by the ALJ's RFC. [T. 25]. As a consequence, we are not confronted, as the Plaintiff suggests, with the circumstance of a Record almost entirely supporting a view of the Plaintiff's condition, which was rejected by the ALJ. To the contrary, the ALJ sustained his obligation to thoroughly parse the Record, and provide a reasoned explanation for his believability findings.

"We will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain," or incapacitation. Gonzales v. Barnhart, supra at 895, quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th

- 39 -

Cir. 2005), quoting, in turn, <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001). "The

credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not

the courts." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001).  Accordingly,

"[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently

substantiated by the record."  <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581 (8th Cir. 2002);

see also, <u>Estes v. Barnhart</u>, supra at 724, citing <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147

(8th Cir. 2001).  We find no basis to reverse the Plaintiff's credibility rulings, and we

reject that challenge to the ALJ's determination.

    b. <u>Whether the ALJ Accorded The Proper Weight To The
Medical Expert's Opinion</u>.

    (1) <u>Standard of Review</u>.  In order to assist him in his

determination of the appropriate RFC, the ALJ is expressly permitted to call for the

testimony of an ME, "who does not examine the claimant but who hears and reviews

the medical evidence and who may offer an opinion." <u>Richardson v. Perales</u>, 402 U.S.

389, 396 (1971); see, <u>20 C.F.R. §§404.1527(a)(2), and 416.927(a)(2)</u>; see also, <u>Hacker

v. Barnhart</u>, 459 F.3d 934, 939 (8th Cir. 2006)("It is also well settled that an ALJ may

consider the opinion of an independent medical advisor as one factor in determining

the nature and severity of a claimant's impairment."), citing <u>Harris v. Barnhart</u>, 356

F.3d 926, 931 (8th Cir. 2004).  "The opinion of such an advisor, even if different from that of an examining physician, may constitute substantial evidence to support a finding of nondisability."  Janka v. Sec'y of Health, Ed. and Welfare, 589 F.2d 365, 369 (8th Cir. 1978).

Nonetheless, as would be true with any treating or consulting physician, the ALJ is not obligated to accept a medical opinion which is, for example, conclusory, or inconsistent with the substantial evidence in the record.  See, Charles v. Barnhart, 375 F.3d 777, 784 (8th Cir. 2004)("conclusory and unsupported by medical findings"); Hacker v. Barnhart, supra at 939 ("inconsistent with substantial evidence in the record").  Ultimately, "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians."  Pearsall v. Massanari, supra at 1218-19, citing Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Bentley v. Shalala, 52 F.3d 784, 785-87 (8th Cir. 1995).

(2)    Legal Analysis.  In arriving at his RFC, the ALJ considered the ME's testimony that, in the work setting, the Plaintiff would need to have access to a bathroom and be allowed to use it when necessary.  [T. 26].  The ALJ compared that opinion to those submitted by the State Agency medical consultants,

who reviewed the Plaintiff's medical records and found no evidence that he would need such accommodation because of his IBS.  In addition, the ALJ cited to the medical records submitted from Dr. Lawson, who was the Plaintiff's primary treating physician, which indicated that the Plaintiff's IBS symptoms had been under control in June of 2001.  The ALJ noted that the only other reference in the Record, to IBS symptoms since the amended onset date, was the Plaintiff's comment, in early 2003, that he had  two (2) to three (3) bowel movements per day -- a personal accounting that did not support an RFC requiring unrestrained access to a bathroom.  Finally, the ALJ considered the lay letters, which were submitted by a former supervisor, and a co-worker of the Plaintiff's.  The ALJ, however, gave these statements little weight as they related to a period before the onset date, and because they were not the qualified opinions of physicians.  See, Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(ALJ can reject lay statements that essentially restate claims of plaintiff), citing Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998).

The Plaintiff also contends that the ALJ abused his discretion by failing to ask the ME for a specific opinion about the significance of the Plaintiff's report, in 2003, that he was having only two (2) to three (3) bowel movements per day.  As we have already mentioned, however, it is the ALJ's function to resolve conflicts in the

medical evidence, and we find no error in the ALJ's determination to reject that portion of the ME's opinion that was not supported by the Plaintiff's medical findings, and the Record as a whole.  Therefore, we find no error in this respect.

>   c.   Whether the ALJ Accorded the Proper Weight to the State Agency Psychological Consultant's Opinion.

>   (1)   Standard of Review.  One of the functions of the ALJ is to resolve conflicts among the treating and examining physicians, and psychologists.  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003); see, Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000)(discussing an ALJ's role in resolving conflicts among medical opinions); 20 C.F.R. §§416.927(d), and 416.927(d)(outlining how medical opinions are to be weighed).  Because State Agency medical and psychological consultants are experts in the Social Security disability programs, an ALJ should give their findings of fact about the nature and severity of a Plaintiff's impairments the same weight as those of nonexamining physicians and psychologists.  Social Security Report  96-6(p), cited in Lichtenstein v. Barnhart, 2006 WL 1554630 at *2 (D. Me., June 1, 2006).

The Regulations provide that "generally, the opinion of a source who actually examines, but does not treat, a claimant (a 'nontreating source') will be given greater

weight than that of a source who has not examined the claimant (a 'nonexamining source'). Stewart v. Barnhart, 2004 WL 736819 at *25 (N.D. Iowa, April 6, 2004), citing 20 C.F.R. §§404.1527(d)(1) & (2) and 416.927(d)(1) & (2). ALJs are not bound by the findings of the State Agency consulting physician or psychologist, "but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." Id.; see, 20 C.F.R. §§404.1527(f)(2)(ii) and 20 C.F.R. 416.927(f) (2)(ii); see also, Quigley v. Barnhart, 224 F. Supp. 2d 357, 368 (D. Mass. 2002). In general, the opinion of a consulting physician who examines the Plaintiff only once does not constitute substantial evidence on the Record as a whole, particularly when there is other, contradictory evidence on the Record. See, Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999); Thompson v. Sullivan, 957 F.2d 611 (8th Cir. 1992); Deakins v. Barnhart, 2003 WL 21246053 *17 (N.D. Iowa, May 29, 2003)(no abuse of discretion when ALJ discounted opinion of neurologist who saw Plaintiff once, and whose opinions conflicted with those of several other doctors).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a nontreating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See,

20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4).  More weight is also to be extended

to "the opinion of a specialist about medical issues related to his or her area of

specialty than to the opinion of a source who is not a specialist."  See, 20 C.F.R.

§§404.1527(d)(5) and 416.927(d)(5).  Further, the Regulations make clear that the

opinions of physicians or psychiatrists, on questions reserved for the Commissioner

-- such as whether a claimant is disabled, or is unable to work -- are not to be given

any weight by the ALJ.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

                (2)   Legal Analysis.   The Plaintiff claims that, in

determining the Plaintiff's RFC, the ALJ failed to give the appropriate weight to the

opinion of the consulting psychiatrist, Johnson.  In her psychological assessment,

which had been arranged by the Commissioner, Johnson noted that the Plaintiff

reported a lifelong struggle with depression that was related to his chronic pain, and

that he had a "guarded" prognosis.  [T. 206-07].  She expressed the opinion that the

Plaintiff would have considerable difficulty in tolerating workplace stressors because

of his depression, anxiety, and chronic pain.  She further felt that the Plaintiff did "not

have the ability to carry out work-like mental tasks with reasonable persistence and

pace."  Id.

The ALJ considered Johnson's psychological assessment of the Plaintiff, and explicitly disregarded her opinion that the Plaintiff was completely unable to tolerate the stressors of the workplace. [T. 25]. However, as a result of Johnson's assessment, the ALJ did reduce the Plaintiff's RFC to jobs that involved only minimal stress levels. The ALJ gave, as his reasons for rejecting Johnson's assessment, the fact that the Record demonstrated that the Plaintiff engaged in a wide range of daily activities, including providing for his own transportation, shopping in the general community, arranging and keeping medical appointments, and acting as a fire warden. Furthermore, the ALJ found little evidence that the Plaintiff could not get along with others, and noted that Johnson's opinion agreed with that assessment. The ALJ imposed the limitation on stressors in the workplace in the RFC because of the Plaintiff's testimony that he was frequently irritable and impatient, [T. 26], and because the Record demonstrated that the Plaintiff's IBS symptoms tended to flare up when he was subject to stress. [T. 25].

Based on our review of the Record as a whole, we conclude that the ALJ afforded Johnson's nontreating opinion the weight that it deserved. See, Estes v. Barnhart, supra at 725; Pearsall v. Massanari, supra at 1219. Johnson never served as a treating consultant for the Plaintiff, but met with him once during an Agency-

arranged consultation.  Her consultation with the Plaintiff was not ignored by the ALJ but was assessed on a principled basis, and was determined to be outweighed by the substantial evidence in the Record as a whole, and we are not empowered to disturb that finding where, as here, the ALJ's resolve falls squarely within a legitimate "zone of choice."

2.     Whether the ALJ Wrongfully Refused To Order Post-Hearing Consultative Examinations to Determine the Plaintiff's Physical And Mental Disabilities.

a.     Standard of Review.  The ALJ has the discretion to keep the Record open after the Hearing either to order a post-Hearing examination of the Plaintiff, or to allow the Plaintiff to introduce post-Hearing evidence that supports his claim.  See, Coffin v. Sullivan, 895 F.2d 1206, 1211 (8th Cir. 1990), citing Wallace v. Bowen, 869 F.2d 187, 191-92 (3d Cir. 1988); Buckler v. Bowen, 860 F.2d 308, 310-11 (8th Cir. 1988).  The ALJ "may also reopen the Hearing at any time before he or she mails a notice of the decision in order to receive new and material evidence."  See, 20 C.F.R. §§404.1544 and 416.944.

"An ALJ is required to obtain additional medical evidence if existing evidence is insufficient to determine disability."  Lehnartz v. Barnhart, 142 Fed.Appx. 939, 943 (8th Cir. 2005); see, Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994); 20 C.F.R.

§404.1527(c)(3).   However, the right to a post-Hearing consultative examination exists only where a Plaintiff's medical sources cannot, or will not, provide sufficient medical evidence to allow for a determination that the Plaintiff is disabled,  see, 20 C.F.R. §§404.1517 and 416.917, and an ALJ may issue a decision without obtaining additional medical evidence if there is sufficient evidence included in the Record to provide a basis for the decision.  See, Lehnartz v. Barnhart, supra at 943, citing Naber v. Shalala, supra at 189.  As long as there is adequate medical evidence of Record, the ALJ has no obligation to supplement the Record with additional evidence.

      b.    Legal Analysis.  The Plaintiff suggests that the ALJ erred when he failed to consider a written request, which was made by his attorney after the Hearing, that because, in the past, a lack of medical insurance had prevented the Plaintiff from receiving more than minimal medical care, he should be provided new consultative examinations concerning his mental and physical health.   See, Plaintiff's Memorandum, supra at 12.  The Plaintiff contends that the ALJ should have arranged for a consultative exam to assess the Plaintiff's "need to use the bathroom on a very regular and unpredictable basis."  Id.

We find no basis to conclude that the ALJ erred in declining to exercise his considerable discretion by ordering new physical and psychological consultations for

the Plaintiff, when the Record was sufficiently developed.  While the Plaintiff protests that he was not able to see a physician on each occasion that he developed symptoms, and therefore, should be allowed to expand the Record after the Hearing, the ALJ identified a number of visits to physicians that the Plaintiff was able to make, in which he, nevertheless, failed to complain about disabling symptoms from either IBS or depression.  We are unable, on this Record, to disagree with the ALJ's conclusion that the evidence was adequate to assess the need for the Plaintiff to have near immediate access to a restroom on a continuing basis, and we agree with the ALJ's implicit determination, that no further consultations were warranted in that respect.  Were the Record insufficient to allow an assessment of the Plaintiff's daily activities, or if the medical records were incomplete so as to suggest to fill a gap in the evidence, a different conclusion could be reached.  However, on this Record, it appears that the Plaintiff was treating with a chiropractor on a weekly basis, and was able to report those complaints to his treating medical doctors that he felt most pressing. Considering the Record as a whole, as we must, we find no cause to remand in order to conduct additional consultative examinations, and find no error in the ALJ's declining to do so.

In sum, finding no error, we recommend that the ALJ's decision be affirmed in all respects, and that Summary Judgment be granted to the Defendant.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Plaintiff's Motion [Docket No. 7] for Summary Judgment be denied.

2.    That the Defendant's Motion [Docket No. 10] for Summary Judgment be granted.


Dated:  November 29, 2006          *s/Raymond L. Erickson*
                                   Raymond L. Erickson
                                   CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 15, 2006** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to

- 50 -

comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 15, 2006,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.